**IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA**

HEATHER COTTIN,                    )
                                   )
    Plaintiff,                     )
                                   )
    v.                             )          No. 2005 C.A. 004952B
                                   )
LOUIS WOLF, ET AL.,                )
                                   )
    Defendants.                    )
                                   )

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER**

    Defendants Louis Wolf, Dolores Neuman, Phillip Wheaton, and Susan Wheaton

("Defendants"), through counsel, hereby submit this Opposition to Plaintiff's Motion for a

Temporary Restraining Order. The baseless allegations in this lawsuit have been filed by a

disgruntled (yet absentee) member of the Board of Directors and a disgruntled former member of

the Board of Advisors in his role as Plaintiff's counsel. Plaintiff is abusing the court system in

an attempt to settle a difference of opinion between directors and, it appears, to gain control of a

nonprofit magazine funded by one of the defendants. She, unlike the defendants, has never taken

an active role in operating, funding, managing, or even governing the Magazine as a director.

Her various complaints, none of which she has standing to translate into legal claims, simply do

not belong in court, but should be settled through discussions among participating Board

members.

    On the present motion, plaintiff cannot demonstrate _any_ of the four factors required for

the issuance of a temporary restraining order – likelihood of success on the merits, irreparable

harm, the balance of harms, or public interest in this case. Indeed, consistent with the imprecise and scattershot allegations she recites in the complaint, Plaintiff has not even bothered to state or analyze any of those relevant factors in her perfunctory motion. For these reasons, plaintiff's Motion for a Temporary Restraining Order should be denied in its entirety.

## I.   FACTUAL BACKGROUND

The scattershot and libelous allegations statements contained in the Complaint make it impossible to provide a meaningful summary of facts that can be termed "relevant" to the "claims" asserted in this "case." What can be provided is a brief summary that sheds light on the intra-corporate nature of any disputes between the parties, and plaintiff and her counsel's malicious use of this ill-conceived lawsuit to gain control of a non-profit magazine, and extort its founder to fund their illegitimate efforts.

Covert Action Quarterly ("CAQ" or "the Magazine") is a quarterly publication that researches and documents the activities of the U.S. Intelligence community and reports on the impact of such activities both in the United States and abroad. See Declaration of Louis Wolf ("Wolf Dec."), attached and incorporated herein as Exhibit 1, at ¶ 4. It was founded in 1978 by Louis Wolf, Ellen Ray, and William Schaap, and, to date, has published 78 editions. Id. It maintains a good reputation and has a substantial and valuable subscriber list. CAQ was incorporated as a nonprofit corporation in the District of Columbia. Id.

CAQ is funded by donations and subscription payments. Mr. Wolf and Dolores Neuman, his wife, have provided the vast majority of the Magazine's funding. From 1986 to 1998, they donated $1,500 per month to the Magazine, plus approximately $20,000 annual for such incidental expenditures as storage, insurance, and emergency expenses. Id. at ¶ 5. From 1998 to

2

2000, they donated $2,000 per month to the Magazine, plus incidental expenses. Id. From 2000 to February 2005, they donated $6,000 per month. Id. In the last twenty years, they have contributed over three-quarters of a million dollars to CAQ. During the last three years, their donations have represented almost half of the Magazine's $150,000 annual budget. Id.

When CAQ was founded in 1978, Ms. Ray served as the Magazine's President, Mr. Wolf served as its Vice President, and Mr. Schaap served as Secretary/Treasurer. Id. at ¶ 6. In March 2001 both Ms. Ray and Mr. Schaap resigned their positions with the intention of starting an on-line version of the publication. Id. In the fall of 2001 CAQ formed a Board of Advisors. Id. at ¶ 7. The original CAQ Advisory Board was comprised of Reverend Philip Wheaton,[1] Bill Montross and J. Michael Springmann (who also provided CAQ occasional legal advice). Id.; see also Declaration of Philip Wheaton ("Wheaton Dec."), attached and incorporated herein as Exhibit 2, at ¶ 4. In the fall of 2002, a Board of Directors was formed when J. Michael Springmann resigned, with Mr. Wolf serving as its President and Rev. Wheaton as Vice-President. Wolf Dec. at ¶ 4; Wheaton Dec. at ¶ 8. The main rationale for forming an official Board of Directors was to assist the Magazine in setting and implementing its priorities. Wolf Dec. at ¶ 4. Three or four months later, Habib (the Magazine's editor) and Mr. Wolf approached Heather Cottin, the Plaintiff in the present matter, about filling the vacancy on the Board. Id.; Wheaton Dec. at ¶ 8. Ms. Cottin said she was interested in filling the vacancy. Wolf Dec. at ¶ 4. In 2003, Habib and Mr. Wolf invited Ms. Cottin to join the Board of Directors as a member. Id.

---

[1] Rev. Wheaton is 80 years old and has been an ordained Episcopal Priest since 1952. Wheaton Dec. at ¶ 3. He has traveled extensively in South and Central America and been involved in Latin American solidarity movements. At the time he joined the Advisory Board, he had contributed a few articles to the Magazine and was familiar with its operations. Id. at ¶ 4.

3

Ms. Cottin was an unpaid Board member and did not have any sort of contract, for employment or other services, with CAQ. Id.

Ms. Cottin lives in New York State. Id. at ¶ 8; Wheaton Dec. at ¶ 9. Since she has joined the Board, the Board has held at least four official meetings. Wolf Dec. at ¶ 8. For each meeting, Mr. Wolf provided Ms. Cottin with notice of the meeting, and informed her that her expenses for traveling to Washington, D.C. for the meetings would be paid. Id. Because Ms. Cottin was a teacher during the relevant time period, Mr. Wolf always scheduled the meetings on the weekends and at times convenient for her participation. Id. Despite her agreement to serve on CAQ's Board of Directors, Ms. Cottin did not attend, or even participate by telephone in, a single CAQ Board Meeting. Id.; Wheaton Dec. at ¶ 9. Nor has she participated in the management or operation of the Magazine in any way. Wolf Dec. at ¶ 8; Wheaton Dec. at ¶ 9. She has never visited CAQ's office in Washington, D.C., or raised or donated any money to the Magazine. Wolf Dec. at ¶ 8.

From October 2001 to November 2002, Richard Ray served as the Magazine's editor. Id. at ¶ 9; Wheaton Dec. at ¶ 6. On November 4, 2002, Mr. Ray left CAQ, taking or destroying a number of different pieces of CAQ property. Wolf Dec. at ¶ 9; Wheaton Dec. at ¶ 6. Mr. Ray then claimed that CAQ owed him severance, resulting in an arbitration with CAQ (held under the rules of the American Arbitration Association). Wolf Dec. at ¶ 9; Wheaton Dec. at ¶ 6. In December 2002, Mr. Springmann resigned from the Board of Advisors, storming out of an informal meeting, stating he did not want to continue sitting at the meeting and he did not want to do any further work for the Magazine. Wolf Dec. at ¶ 9; Wheaton Dec. at ¶ 6. In July 2004, Mr. Springmann testified for Mr. Ray at the Arbitration hearing. Wolf Dec. at ¶ 9; Wheaton Dec.

4

at ¶ 6. He testified that Mr. Ray was entitled to all of the severance he claimed. Wolf Dec. at ¶ 9; Wheaton Dec. at ¶ 6. On August 9, 2004, the Arbitrator, clearly not crediting Mr. Springmann's testimony, ruled against Mr. Ray. Wolf Dec. at ¶ 9; Wheaton Dec. at ¶ 6. The Arbitrator found that Mr. Ray had been paid all severance to which he was entitled, and that Mr. Ray was, in fact, liable to CAQ for filing a frivolous and baseless arbitration and for his theft and destruction of CAP property. Wolf Dec. at ¶ 9; Wheaton Dec. at ¶ 6. The Arbitrator ordered Mr. Ray to reimburse to CAQ $8,000 for the lost or destroyed property, and to reimburse CAQ for the attorney's fees and costs the magazine incurred in defending the suit. Wolf Dec. at ¶ 9; Wheaton Dec. at ¶ 6.

Mr. Springmann, an obviously disgruntled former CAQ Advisory Board Member who was unsuccessful at harming the Magazine through Mr. Ray's arbitration, is now serving as counsel for the Plaintiff in this case. Wolf Dec. at ¶ 10; Wheaton Dec. at ¶ 7.

A major issue confronting the Board before and after Ms. Cottin's ascension to the Board was an ongoing pay dispute with its editor, Habib. Id. at ¶ 11. Even though Habib worked for CAQ from 1991 to 2005, providing both voluntary service and staff assistance, he has refused to reveal his last name to anyone at the Magazine. Id.; Wheaton Dec. at ¶ 5. Habib worked from 1991 to 1998, on a part-time basis, mostly in the evening hours at the Magazine during the final weeks prior to its quarterly publication, and was paid for his services. Wolf Dec. at ¶ 11. In early 2001, Habib complained that the Magazine owed him $27,000 for past services. Id. The Magazine provided Habib with three separate payments of $9,000 each to satisfy the alleged shortfall; the last payment was made in March 2001, at which time Habib stated that the Magazine was "even" with him regarding his backpay. Id. During this time, Habib also stated

that he wanted to receive $24,000 a year going forward. Id. The Magazine agreed to pay him this amount and, in fact, pay him this amount going forward. Id.

Yet, beginning in the fall of 2002, Habib claimed that the Magazine still owed him backpay. Id. at ¶ 12. This has been a difficult issue to resolve because of Habib's personality, and his inability to determine how much backpay he believes he is entitled to. Id. At different times, Habib has claimed that he is owed $60,000, or $150,000, or $200,000. Id. Habib has grown increasingly abusive towards Mr. Wolf and Rev. Wheaton. Id. In early 2004, Habib threatened to cease editing the Magazine if Mr. Wolf did not pledge to continue his financial support. Id. Under that duress, on March 3, 2004, Mr. Wolf pledged to Covert Action Publications to continue to provide financial support to the Magazine. Id. Mr. Wolf was provided no consideration for his pledge of continued support. Id. Neither Covert Action Publications nor CAQ took any steps in reliance on his charitable pledge. Id.

Rev. Wheaton repeatedly tried to facilitate a resolution to the problem. Id. at ¶ 13. He had numerous separate conversations with both Habib and Mr. Wolf about the dispute. Wheaton Dec. at ¶ 10. For example, on September 14, 2004, Mr. Wolf and Ms. Neuman came to his house to discuss the debt issue and ways of resolving the dispute. Id. Rev. Wheaton made it absolutely clear from the outset that this was an informal, not an official, meeting and that no official decisions would be made. Id. During this meeting, Rev. Wheaton learned about that Habib had received three separate payments of $9,000 each and that Habib had expressed to Ms. Neuman that he was "even" with the Magazine. Id. A few days later, on Friday, September 17, 2004, Rev. Wheaton met with Habib and Mr. Wolf in the CAQ office. Id. at ¶ 11. When he informed Habib of the meeting at his house a few days earlier, Habib screamed in protest,

6

claiming that it was an illegal Board meeting. Id. Habib repeatedly insulted Rev. Wheaton and impugned his character. Id. Among other epithets, Habib called him "a racist," and said that he had "no right to call [himself] a Christian." Id. Habib then ran out of the office. After a few minutes, Rev. Wheaton went to the lobby of the building, where Habib, upon seeing him, continued to yell at him. Id. Rev. Wheaton asked Habib to speak with him outside, where Habib continued to insult him in a loud voice. Id. Unable to continue, Rev. Wheaton asked Habib to call him when he was ready to discuss the matter calmly and rationally. Id. Habib never called Rev. Wheaton.

Shortly after those outbursts, in September or October 2004, Habib called Rev. Wheaton's wife and told her that if the debt was not paid he would "come after [their] house," a threat that greatly upset his wife. Id. at ¶ 12.

Rev. Wheaton continued to try to mediate the dispute with Habib but was disappointed in his efforts because Habib would change the amount he claimed to be owed to him as backpay, or refuse to cooperate with Rev. Wheaton's various efforts to help broker a resolution. Wolf Dec. at ¶ 13; Wheaton Dec. at ¶¶ 5, 13. At one point, Rev. Wheaton enlisted the assistance of a private independent mediator, Dr. John Johnson. Wolf Dec. at ¶ 13; Wheaton Dec. at ¶ 13. A mediation was scheduled for and held with Dr. Johnson on December 18, 2004 at CAQ's office in Washington, D.C. Id. Habib and Ms. Cottin refused to participate. Id. Ms. Cottin stated her objections in a letter to Rev. Wheaton, dated December 17, 2004. See Wolf Dec. at ¶ 13, attached thereto as "Attachment A;" Wheaton Dec. at ¶ 13, attached thereto as "Attachment A." Ms. Cottin opened the letter by writing:

I have been a worker most of my life, and always in a union. When management

7

> is at odds with labor occasionally they could both agree that the impasse would
> only be resolved by submitting to arbitration or mediation. In my experience as a
> union militant, since 1966, management was always desirous of forcing us to
> submit to the decision of outside forces.

Id. Ms. Cottin expressed vehement disregard for the mediation process and called attempts to

mediate Habib's dispute "bullying and dictatorial." Id. Without apparent knowledge of the

Board's attempts to resolve Habib's dispute or of the Magazine's payments to him, she added:

> I absolutely deny the right of management, in this case two ill-advised members of the
> Board of Covert Action Publications, to force labor (the editor of the magazine) to do its
> bidding in matters concerning contract and slavery. The theft of services from Habib is in
> violation of US labor law including the 13th Amendment, which prohibits slavery.

Id. She signed the letter, "[I]n solidarity with the workers and the oppressed, Heather Cottin."

Id. After the mediation, Dr. Johnson called Habib, who expressed similar hostility to the

mediation process. Id. Following a verbal outburst by Habib at Rev. Wheaton, all major efforts

to resolve the pay issue with Habib broke down. Id.

In early January 2005, Mr. Wolf and Rev. Wheaton both went on separate trips abroad.

Wheaton Dec. at ¶ 14. Mr. Wolf traveled to Vietnam and Laos with his wife, leaving the United

States on January 7, 2005, and returning on January 27, 2005. Wolf Dec. at ¶ 14. Rev. Wheaton

traveled to Nicaragua with his wife, leaving the United States on or about January 3, 2005, and

returning on February 15, 2005. Wheaton Dec. at ¶ 14. Immediately upon his return to the

United States, Mr. Wolf was hospitalized in Chicago for a blood clot in his leg that his doctors

deemed life threatening. Wolf Dec. at ¶ 14. In the beginning of March, Mr. Wolf was flown by

air ambulance to Georgetown University Medical Center, where he had two surgeries –

ultimately, he underwent nine different surgeries – in an attempt to save his leg. Id. By March 9,

2005, it was apparent that his leg could not be saved and he underwent surgery to have it

8

amputated. Id. Upon his own return to the United States, Rev. Wheaton learned that the arteries

to his heart were severely blocked. Wheaton Dec. at ¶ 14. He had to undergo quintuple heart

bypass surgery on March 8, 2005. Id.

During their respective stays in the hospital, Mr. Wolf and Rev. Wheaton had no ability

to monitor or control Habib, or his activities in the management of the office at CAQ. Wolf Dec.

at ¶ 15; Wheaton Dec. at ¶ 15.

Mr. Wolf returned to CAQ's office in early May 2005. Wolf Dec. at ¶ 15. He found the

office to be in total disarray. Id. He found a number of checks, from subscribers, donors and

retail distributors, that should have been deposited in the Magazine's bank account but were not.

Id. He could not find deposit slips, the Magazine's checkbook or bank statements. Id. There

were piles of unopened mail, including letters that should have been directed to Mr. Wolf and

Rev. Wheaton. Id. In short, he discovered that in his (and Rev. Wheaton's) absence, Habib had

completely neglected the Magazine and apparently hidden, taken or destroyed Magazine

property. Id.

On May 12, 2005, Mr. Wolf met with Jim Drew (counsel for CAPublications ("CAP"),

Inc. and CAQ), Rev. Wheaton, Bill Montross, and Ms. Neuman. Id. at ¶ 16; Wheaton Dec. at ¶

16; see also Declaration of James E. Drew ("Drew Dec."), attached and incorporated herein as

Exhibit 3, at ¶ 5. At that meeting, Mr. Wolf and Ms. Neuman mentioned that they had learned,

from examining CAQ's bank account, of two CAQ checks that were payable to Habib (in the

amount of $3,000 each) that Rev. Wheaton had written recently and signed. Wolf Dec. at ¶ 16;

Wheaton Dec. at ¶ 16; Drew Dec. at ¶ 5. The memo sections of the checks claimed that the

checks represented monthly fees for Habib for two months early in the year 2005. Id. Rev.

9

Wheaton denied writing the two checks to Habib. Id. When Ms. Neuman showed Rev. Wheaton

the checks, he was stunned to find that although he had not signed the checks they had been

signed in his name. Id. (Indeed, the date on one of the checks was February 3, 2005, when Rev.

Wheaton was still in Nicaragua.) Wheaton Dec. at ¶ 16. Because only Mr. Wolf and Rev.

Wheaton had signatory authority on the account, and because Habib was the staff member with

lone access to the checkbook, it seemed likely that Habib had either forged or copied the

signature of Rev. Wheaton on the two checks.[2] Wolf Dec. at ¶ 16; Wheaton Dec. at ¶ 16; Drew

Dec. at ¶ 5.

Following his recovery from heart surgery, Rev. Wheaton alerted Mr. Wolf and Habib

that he wanted to resign from CAQ's Board because of the extreme stress it was causing him.

Wolf Dec. at ¶ 17; Wheaton Dec. at ¶ 17. Mr. Wolf immediately began looking for a

replacement and tried to schedule a Board meeting to vote in a new member. Wolf Dec. at ¶ 17.

He identified Mark Looney as an attractive candidate for the expected vacancy. Id. On May 25,

2005, he spoke by telephone with Ms. Cottin about setting up a Board meeting to find a

replacement for Rev. Wheaton. Id. He told Ms. Cottin that Rev. Wheaton wanted to resign for

health reasons. Id. He also told her that Mark Looney, an activist in the Washington area, had

volunteered to join the Board. Id. Ms. Cottin asked what the hurry was, and Mr. Wolf informed

her that Rev. Wheaton was no longer able to continue on the Board because of the increased toll

that the disputes at the Magazine were causing to his health. Id. Ms. Cottin said that she knew

of people in the District of Columbia, Baltimore, New York, and California who would make

good candidates; therefore, Mr. Wolf asked her to submit the names of any people that she

---

[2]The bank is currently investigating the apparent forgery.

thought would be good Board members. Id. Ms. Cottin suggested that he call her back at 7 p.m. on June 1, 2005, when she would agree to the date and time for the Board meeting. After the call, Mr. Wolf emailed her Mr. Looney's CV. Id.

As agreed, Mr. Wolf called Ms. Cottin at 7 p.m. on Wednesday, June 1, 2005. Id. at ¶ 18. She said, "I have a meeting, I have to go" and then hung up. Mr. Wolf tried to contact her again at 9:30 p.m. Id. There was no answer. Id. Ms. Cottin did not return his earlier phone call. Id. Mr. Wolf called Ms. Cottin at 4:30 p.m. on June 2, 2005. Id. There was no answer. Id. He then sent Ms. Cottin an email telling her that he would call her that evening (June 2, 2005) to schedule the Board meeting, which because of Rev. Wheaton's failing health he had scheduled for Friday, June 3, 2005 at 7 p.m. (to be held via conference call with Rev. Wheaton). Id., and Email from Wolf to Cottin, 6/2/05, and draft thereof, attached thereto as "Attachment B" and "Attachment C." Mr. Wolf informed Ms. Cottin that there would only be one agenda item – Rev. Wheaton's replacement and resignation – and invited her to submit names for his replacement. Id. He informed Ms. Cottin that the "it [was] imperative for us to deal with this immediately" and the situation was an "emergency." Id.

On Friday, June 3, 2005, at 8:35 p.m., a three-way conference call was set up between Mr. Wolf, Rev. Wheaton and Ms. Cottin. Id. at ¶ 19; Wheaton Dec. at ¶ 18. With Rev. Wheaton and Mr. Wolf on the line, the operator tried Ms. Cottin. Id. There was no answer. Id. Mr. Wolf and Mr. Wheaton did not know whether Ms. Cottin was at home, or whether she refused to answer the phone. Id., and "June 3, 2005" Notes, attached thereto as "Attachment D." Constituting a quorum (two of the three Board members), Mr. Wolf and Rev. Wheaton proceeded with the meeting. Id. Mr. Wolf nominated Mr. Looney as a candidate to the Board.

11

Id. Rev. Wheaton asked Mr. Wolf a number of questions about Mr. Looney's qualifications, which Mr. Wolf answered. Id. Both Rev. Wheaton and Mr. Wolf voted to place Mr. Looney on the Board. Id. Thus, by a 2-0 vote, Mr. Looney was elected to the Board of Directors. Id. After Mr. Looney's election, Mr. Wolf accepted with deep regret Rev. Wheaton's resignation from the Board.[3] Id.

On June 8, 2005, Mr. Wolf sent an email to Ms. Cottin inviting her to a Board Meeting to take place on June 17, 2005 in Washington, D.C., "with an agenda of all outstanding issues and the future of the magazine." Id. at ¶ 20, Email from Wolf to Cotton, 6/8/05, and draft thereof, attached thereto as "Attachment E" and "Attachment F." In the email, Mr. Wolf explained that the Magazine would pay for her travel and lodging expenses (as she lived in New York). Id. Mr. Wolf also wrote: "If you are unable to come to DC at that time, we can hold the Board meeting by conference call and you can participate fully at any earlier date and time that you suggest by return e-mail." Id. Via letter, Ms. Cottin responded that she considered the meeting to be illegal because Mr. Wolf had sent her notice of the meeting by electronic mail, a position that simply made no sense – since plaintiff clearly had actual notice of the meeting – and, according to CAQ's counsel, was based on a faulty reading of the relevant District of Columbia statute.[4] Id.,

---

[3] After his resignation became official, Rev. Wheaton immediately withdrew his name as a signer of CAQ checks and has had no involvement with CAQ. Wheaton Dec. at ¶ 19.

[4] Ms. Cottin did not claim that the June 3, 2005 meeting, at which Rev. Wheaton was replaced on the Board by Mr. Looney, was in any way invalid. In fact, her communication to Mr. Wolf assumed that the resignation of Rev. Wheaton was effective. Wolf Dec. at ¶ 20, and Letter from Cottin to Wolf, undated, attached thereto as "Attachment G." Yet, she provided no notice of her own proposed meeting to Mr. Looney, who rightfully took Rev. Wheaton's place on the Board as of the June 3, 2005 meeting. She apparently wished to believe that only Mr. Wolf and her were active members of the Board, so that she could claim later that she had convened a meeting and constituted herself as a quorum of one.

and Letter from Cottin to Wolf, undated, attached thereto as "Attachment G." She also stated
that she wanted to convene her own meeting of the Board of Directors on June 23, 2005 in New
York. Id. She did not provide notice of this meeting to Mr. Looney. Id.

On June 17, 2005, a Board meeting was held, with Ms. Cottin again absent. Id. ¶ 21. The
Board was extremely concerned that Habib would return to the office and attempt to remove or
destroy other Magazine assets, as his predecessor Mr. Ray had done. Id. Therefore, Mr. Wolf
and Mr. Looney considered and approved five motions – namely, to suspend operations of CAQ
for at least three months; to terminate all contractual and financial relationships with Habib and
Giang Tran (the webmaster); to stop all activity towards the next issue of the Magazine; to
designate Mr. Wolf to carry out the motions and handle any problems or issues arising therefrom;
and to adjourn. Id. The Board's goal was to suspend all publishing until Habib's situation could
be resolved and the Magazine's assets could be secured. Id.

On June 20, 2005, Mr. Wolf, Jim Drew, Ms. Neuman, and two locksmiths went to CAQ's
office. Id. at ¶ 22; Drew Dec. at ¶ 4. Upon arrival, they realized that the bottom lock already had
been changed. Id. They called Michael Earley, the Building Manager for 1500 Massachusetts
Avenue, who tried all of his pass keys but was unable to open the lock. Id. The locksmith had to
"pick" the lock before they could enter the office. Id. Because Habib was the only person who
was staffing the office regularly, they concluded that Habib had changed the lock on the office
door and had not informed either Mr. Wolf or the Building Manager. Id. Inside, the office was
again in a state of complete disarray. Wolf Dec. at ¶ 22. There were piles of papers on the desks
and stacks of unopened mail. The Magazine's deposit slips, checkbook, and bank statements
were still missing. Id. There were opened and unopened envelopes containing bills that were

13

long overdue, as well as opened envelopes from subscribers, with checks removed (and not yet located). Id. There were donations going back six months that had not been deposited in the CAQ account. Id. There were also unopened tax notices. Id. During this visit, Mr. Wolf taped an envelope containing a letter for Habib to the door informing Habib of the Board's action of June 17, 2005. Wolf Dec. at ¶ 22; Drew Dec. at ¶ 6. A copy of the note was also left, in an envelope addressed to Habib, at the front desk of the office building. Id. The building's receptionist later informed Mr. Wolf that she had given the letter to Habib. Wolf Dec. at ¶ 22. Although the letter stated that Mr. Drew was authorized to resolve Habib's financial issues, advised Habib to contact Mr. Drew regarding them, and provided Mr. Drew's contact information, Habib never contacted Mr. Drew.[5] Wolf Dec. at ¶ 22; Drew Dec. at ¶ 6.

Additionally, on June 20, 2005, fearing that Habib would convert CAQ assets, and on the advice of legal counsel, Mr. Wolf closed CAQ's bank account with Wachovia (which the Magazine had maintained since 1978) and opened another account with the same bank. Id. ¶ 23.

On June 22, 2005, Mr. Drew sent an email message to plaintiff. Drew Dec. at ¶ 7, and Email from Drew to Cottin, 6/22/05, attached thereto as "Attachment A." In that email, he informed her that a "Board meeting" that she had proposed for June 23, 2005, was illegal, null

---

[5]On June 21, 2005, Mr. Drew telephoned Mr. Springmann and told him that CAQ had authorized him to resolve all financial issues with Habib. Drew Dec. at ¶ 6. Mr. Drew requested that Mr Springmann ask Habib to contact him. Id. Mr Springmann said he would do so if he was contacted by Habib. Id. Additionally, in the late afternoon of June 21, 2005, Mr. Drew spoke with a women named "Ream" (phonetic), a mutual acquaintance of both Mr. Drew and Habib. Id. Mr. Drew never received any response or inquiry from Habib or on his behalf until the evening of July 7, 2005. Id. On that date, at a social gathering, Mr. Drew met James Klimaski, Esquire, who told him that he was going to represent Habib on his financial claims against CAQ. Id. Mr. Drew initiated settlement discussions with Mr. Klimaski promptly thereafter. Id. Yet, like Mr. Wolf and Rev. Wheaton before him, Mr. Drew is still awaiting a demand figure from Mr. Klimaski. Id.

and void, and would not have a quorum present. Id. He also reminded her that at the June 3, 2005 Board meeting, Mr. Looney had replaced Rev. Wheaton as a Board member. Id. Last, he informed plaintiff that even if she considered the June 3, 2005 meeting invalid for some reason, Rev. Wheaton would still be a member of the Board because Rev. Wheaton's resignation was "following and subject to his replacement on the Board of Directors." Id. Nonetheless, Ms. Cottin illegally and invalidly convened a Board meeting of one on June 23, 2005, at which she purported to remove Mr. Wolf from the Board and replace him with two other members, whose names she had never provided to either Mr. Wolf or Mr. Looney.

In early July, Mr. Wolf learned that two computers in the office that contained information – including emails – critical to CAQ had been largely erased. Wolf Dec. at ¶ 24. Recently, Mr. Wolf has also learned that the Magazine's electronic copies of issues 75 to 78 have been removed from the hard drive of another computer, the office Mac. Id.

On July 12, 2005, Mr. Springmann appeared at CAQ's bank (Wachovia) and requested access to the account. Id. at ¶ 23. He was told that only signatories have access to the account; he admitted that he was not a signatory. Id. The following day, Ms. Cottin faxed a letter to Debbie Rinehart, the Assistant Vice President of the bank. Id., and Letter from Cottin to Rinehart, 7/12/05, attached thereto as "Attachment I." In it, Ms. Cottin asserted, without any basis in fact, that Mr. Springmann was the attorney for Covert Action Publications. Id. She also claimed that Mr. Wolf had been voted off the Board of Directors, was "no longer associated with Covert Action Publications," had been named in "a $200,000 lawsuit," and was removing property from CAQ's office. Id. In yet another attempt to seize control of the Magazine, she asked that the bank freeze the new account "until such time as you place my name as sole

15

Magazine's bank account.

Now, through the law offices of a disgruntled former Advisory Board Member, plaintiff and her counsel have abused the court's processes by filing this ridiculous lawsuit. The Complaint appears to be little more than a "shakedown" of the defendants. Plaintiff, it should be noted, appears to be suing defendants in her personal capacity, and not on the behalf of the Board of Directors or of CAQ. She does not assert how she can do this. Nor can she, given that she has no contract with CAQ – she is not even paid to serve on the Board of Directors. Nor does she allege any tort injuries to herself. Moreover, plaintiff has sued not only Mr. Wolf and Rev. Wheaton, who are and have been Board members, respectively, but also their wives, neither of whom has ever served in any official capacity on the Board of Directors or on the Magazine. What Plaintiff apparently hopes to do is air every criticism of Mr. Wolf and Rev. Wheaton that she can think of – be it real, imagined, or fabricated – in an attempt either to shake some money out of the Wolf and Wheaton families, or to gain control over the operations of CAQ, a magazine that Mr. Wolf founded, and has published largely with his own and his wife's money for over 28 years. In short, she apparently would like to control and operate CAQ herself, and force Mr. Wolf to continue to fund it.

1.    **Plaintiff Cannot Show A Likelihood of Success on the Merits Because, Even Assuming that the Court Could Discern Plaintiff's Claims, They Are All Premised On the Absurd Notion That Plaintiff Is Currently In Control of the Magazine.**

Even assuming for present purposes that the contours of a claim could be discerned from

existed when the suit was filed," thus seeking to "alter the status quo rather than to maintain it," the movant "must be held to a substantially higher standard than in the usual case." Fountain, 630 A.2d at 688, citing Doe v. New York Univ., 666 F.2d 761, 773 (2d Cir. 1981) and National Ass'n of Rehabilitation Facilities, Inc. v. Schweiker, 550 F. Supp. 357, 365 (D.D.C. 1982).

## III.    ARGUMENT

### A.    PLAINTIFF CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiff cannot demonstrate a likelihood of success on the merits.  Nor does her motion even make such an attempt.  Indeed, it is nearly impossible to determine what "the merits" of this case are.  The Complaint makes a litany of libelous statements without identifying even one cognizable legal claim.  This should not be surprising as Plaintiff has no valid legal claims. What she appears to have are a series of disagreements over the operation of the Magazine - - matters that should be resolved through proper corporate procedures, such as discussions, debates, and votes at meetings of the Board of Directors.  Yet, despite her agreement to serve on the Board of Directors, Plaintiff has never participated in these meetings.  Indeed, she ignored the Magazine for two years.  This Spring, however, on the heels of Mr. Wolf and Rev. Wheaton's serious illnesses, and having failed previously to participate or to convince them of the merits of her positions, Plaintiff has attempted to leverage Habib's dispute into her own control of the Magazine.  Consistent with that purpose, she willfully and petulantly ignored valid decisions by Mr. Wolf, Rev. Wheaton, and (as of June 3, 2005) Mr. Looney, unplugging her ears just long enough to issue a set of invalid directives and decisions that make a mockery of reasonable procedures.  She has also moved, again on her own and invalidly, to seize control of the

17

Magazine's bank account.

Now, through the law offices of a disgruntled former Advisory Board Member, plaintiff and her counsel have abused the court's processes by filing this ridiculous lawsuit. The Complaint appears to be little more than a "shakedown" of the defendants. Plaintiff, it should be noted, appears to be suing defendants in her personal capacity, and not on the behalf of the Board of Directors or of CAQ. She does not assert how she can do this. Nor can she, given that she has no contract with CAQ – she is not even paid to serve on the Board of Directors. Nor does she allege any tort injuries to herself. Moreover, plaintiff has sued not only Mr. Wolf and Rev. Wheaton, who are and have been Board members, respectively, but also their wives, neither of whom has ever served in any official capacity on the Board of Directors or on the Magazine. What Plaintiff apparently hopes to do is air every criticism of Mr. Wolf and Rev. Wheaton that she can think of – be it real, imagined, or fabricated – in an attempt either to shake some money out of the Wolf and Wheaton families, or to gain control over the operations of CAQ, a magazine that Mr. Wolf founded, and has published largely with his own and his wife's money for over 28 years. In short, she apparently would like to control and operate CAQ herself, and force Mr. Wolf to continue to fund it.

1.    **Plaintiff Cannot Show A Likelihood of Success on the Merits Because, Even Assuming that the Court Could Discern Plaintiff's Claims, They Are All Premised On the Absurd Notion That Plaintiff Is Currently In Control of the Magazine.**

Even assuming for present purposes that the contours of a claim could be discerned from the Complaint and that plaintiff would have standing to pursue it, any claim she would have appears to be premised on her absurd belief that she is now in control of the Magazine.

18

Apparently plaintiff believes that the Board meeting of one that she convened on June 23, 2005, during which she purported to remove Mr. Wolf from the Board of Directors, and elect two new Board members, gave her authority to govern the Magazine and, therefore, seek judicial action against those who purport to harm it. This belief is nothing short of absurd.

Plaintiff has never claimed that the June 3, 2005 meeting – to which she was invited numerous times via numerous methods, but refused to attend – was invalid. At that meeting, and in observance of requisite formalities, Mr. Wolf and Rev. Wheaton voted Mr. Looney to the Board of Directors, at which point Mr. Wolf accepted Rev. Wheaton's resignation. Thus, as of June 3, 2005, the Board of Directors consisted of Mr. Wolf, Mr. Looney and Ms. Cottin. Mr. Wolf then notified plaintiff of a meeting of the Board of Directors on June 17, 2005, to consider the future of the Magazine, which was reeling because of Habib's neglect and possibly fraudulent and illegal actions. Ms. Cottin claimed that *this* proposed meeting was invalid on the ground that notice had been sent by email. Yet, the statutory provision she relied on to support this argument, D.C. Code § 29-301.33, was plainly inapposite. See Wolf Dec. at ¶ 20, and Letter from Cottin to Wolf, undated, attached thereto as "Attachment G;" Drew Dec. at ¶ 7, and Email from Drew to Cottin, 6/22/05, attached thereto as "Attachment A." Nowhere does the section forbid email notification for regular Board meetings. It simply requires five-day, postal notice for the "organization" meeting at which the Board initially establishes procedures for the nonprofit corporation, an event long since held by CAQ. See D.C. Code § 29-301.33. Mr. Drew, CAQ counsel, explained to plaintiff at the time, that a regular Board of Directors' meeting clearly may be noticed under a course of practice, such as by telephone or email. See Drew Dec. at ¶ 7, and Email from Drew to Cottin, 6/22/05, attached thereto as "Attachment A." Moreover, there is

19

no dispute that plaintiff had *actual* notice of the meeting, rendering her attempt to hide behind a notice argument willfully blind. See Wolf Dec. at ¶ 20, and Letter from Cottin to Wolf, undated, attached thereto as "Attachment G."

Thus, despite having valid notice of the June 17, 2005 meeting, Plaintiff refused to attend. At that meeting, Mr. Wolf and Mr. Looney constituted a quorum and passed a series of motions addressing the numerous problems that Habib had caused the Magazine. Disregarding this properly held meeting, plaintiff attempted, invalidly, to convene her own meeting on June 23, 2005. Even though she failed to provide notice of her proposed meeting to Mr. Looney, see Wolf Dec. at ¶ 20, received notice of the impropriety of her meeting from CAQ counsel, and lacked a quorum, plaintiff purported to remove Mr. Wolf from the Board and elect two new members. In sum, plaintiff's argument that she controls CAQ depends on a series of maneuvers that are simply absurd.

Even if plaintiff were, somehow to show that the June 3, 2005 meeting was invalid, what would logically flow from such a finding is that Rev. Wheaton's resignation is invalid, and he is still on the Board.[6] Thus, following the meeting, a quorum would still consist of two members of the Board, rendering plaintiff's one-person June 23, 2005 meeting null and void. Similarly, even if plaintiff could somehow show that the June 17, 2005 meeting was invalid, then her remedy would be to have the Court invalidate the June 17, 2005 meeting and order a new meeting with

---

[6] In a staggering display of double-speak, plaintiff both assumes and denies Rev. Wheaton's valid resignation. She assumes it, in concluding that because the Board contained only two members – herself and Mr. Wolf – she could convene a one-person quorum on June 23, 2005. Yet she also denies his resignation, since she has named Rev. Wheaton (not to mention his wife) as a defendant.

the current Board (plaintiff, Mr. Wolf, and Mr. Looney).[7]  In short, even if she were somehow to

state a claim regarding either the June 3, 2005, or June 17, 2005 meetings, (which defendant

argues she does not) the damages that she claims, do not flow from either of these meetings.

Thus, even if it were possible to make heads or tails of the Complaint in this case, it is

simply impossible to look past the factual premise at the heart of any of Plaintiff's claims – that

her series of petulant, willfully blind, procedural maneuvers have given her control of the

Magazine.

2.     **Plaintiff Cannot Show A Likelihood of Success on the Merits Because She
       Does Not Have Standing to Bring Any of the Claims Purportedly Asserted in
       Her Complaint and the Complaint Fails to State Any Claims At All.**

Plaintiff does not have standing to assert any claims that the Court might discern from her

complaint.  "[T]o meet the minimum requirements of a 'case and controversy,' a plaintiff must

show that it has 'suffered some actual or threatened injury as a result of the putatively illegal

conduct of the defendant.'"  Community Credit Union Servs., Inc. v. Federal Exp. Servs. Corp.,

534 A.2d 331, 333 (D.C. 1987); see also Board of Elections for District of Columbia v.

Democratic Central Comm., 300 A.2d 725, 726 (D.C. 1973) (reversing grant of preliminary

injunction because plaintiff failed to demonstrate standing).  "[A] plaintiff may assert only its

own legal rights," not those of other third parties.  Id., citing Under Valley Forge Christian Coll.

v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 474-75 (1982).  Until

recently, plaintiff was an unpaid Board Member and, even then, in name only.  She completely

---

[7]In fact, by the time of the June 17, 2005, Rev. Wheaton was off the Board.  Therefore, to
the extent that plaintiff claims it is this, June 17, 2005 meeting that is invalid, Rev. Wheaton
could not be responsible for the meeting or any of the decisions of the Board at that point.  Thus,
he is not liable to plaintiff in any way.

ignored her duties, and did not participate in at least four Board meetings held during her tenure despite being given notice of the meetings. Nor does she hold any type of employment relationship with CAQ or take part in any aspect of the operations of the Magazine. She has never even donated money to the Magazine. Last, she clearly has not brought this lawsuit in any official capacity connected with CAQ. The claims that she purports to assert clearly belong to other people. The core of plaintiff's lawsuit seems to be the assertion that defendants have mistreated a "prior editor" – presumably Habib, though he is not even identified by name – by failing to pay him his full salary, and by discriminating against him. If there is any legal claim to be made here – which there is not – it is clear that the claim must be brought by this former editor, and not by plaintiff, who has no standing to sue for a wrong that was allegedly done to someone else.[8] Similarly, plaintiff alleges other assorted wrongdoing by defendant, such as "fraud on magazine subscribers," "tax fraud," and "violation of U.S. government travel restrictions and Office of Foreign Assets Control regulations" (Compl. 4-5), but she does not have standing to bring these claims either, as any alleged harm would have been done to magazine subscribers or the U.S. government, respectively.

Second, the Complaint clearly does not give defendants any notice of the claims actually asserted against them. Even under the liberal "notice pleading" rule in the District of Columbia, a complaint must still set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," D.C. Sup. Ct. Rule 8(a), and "fairly put[] the defendant on notice of the

---

[8]Even then, any "wrong" has long since been righted. In early 2001, Habib complained that the Magazine owed him $27,000 for past services. Id. The Magazine provided Habib with three separate payments of $9,000 each to satisfy the alleged shortfall. In March 2001, when the last payment was made, Habib stated that the Magazine was "even" with him regarding his backpay. Id.

claim against him." <u>Scott v. District of Columbia</u>, 493 A.2d 319, 323 (D.C. 1985). Here, the

Complaint merely recites various types of "egregious past behavior," such as "Lockouts,"

"Crackpots," and "Harassment," which clearly do not state causes of action. Compl. at 4-5.

Earlier in the Complaint, plaintiff claims that defendants have "illegally seized control of the

magazine Covert Action Quarterly" "in violation of D.C. Code § 29-301 <u>et seq.</u>," id. at 2, but she

cites not to a specific statutory provision but to the entire chapter of the D.C. Code governing

non-profit organizations, leaving defendants with no clue as to what specific provision they are

alleged to have violated. As a result, even under notice pleading standards, plaintiff's Complaint

gives defendants no notice whatsoever of what causes of action the lawsuit is based upon. As her

Complaint would thus clearly be subject to a motion to dismiss for failure to state a claim,

plaintiff cannot fairly be said to have demonstrated a likelihood of success on the merits.[9]

Furthermore, a substantial portion of the Complaint will be subject to a motion to strike for its

completely inappropriate use of "immaterial, impertinent, or scandalous" allegations. D.C.

Super. Ct. Rule 12(f). Plaintiff's repeated descriptions of defendant Phillip Wheaton as a

"divorced priest," and of defendant Louis Wolf as "a millionaire with a $25,000.00 a month trust

fund," for example, are not only insulting and impertinent, but have no conceivable relevance to

this matter. Similarly, the Complaint's baseless allegations that defendants have engaged in theft

against third parties, lockouts and harassment of staff members, publication of "crackpot" articles

by "lunatics," and engaged in tax fraud and violation of federal import regulations have no

relevance to what appears to be charitably described as a breach of contract claim. They are

clearly subject to a motion to strike.

---

[9] Defendants will file a motion to dismiss on or before July 25, 2005.

23

Finally, the allegations in plaintiff's Complaint have no basis in reality. Both plaintiff, Heather Cottin, and her attorney, J. Michael Springmann, are present or former disgruntled Board Members. Mr. Wolf has legal authority to manage *Covert Action*, as a current officer and director of this magazine. Wolf Dec. at ¶¶ 2-7, 19-21, 26. Indeed, even plaintiff's Complaint concedes that "Defendant Louis Wolf . . . is President of Covert Action Publications, a Washington, D.C., not-for-profit corporation, and a member of its Board of Directors." Compl. at 1. Moreover, Mr. Wolf's declaration makes clear that Mr. Wolf never breached any contract with respect to the funding of *Covert Action*, or committed any other wrong towards plaintiff. See generally Wolf Dec. If and when the facts of this case are weighed by the Court, therefore, it is clear that defendants will prevail.

As plaintiff is unable to demonstrate a likelihood that she will succeed on the merits in her complaint against defendants, her motion for temporary restraining order must be denied.

**B.    PLAINTIFF WILL NOT SUFFER, AND CANNOT SUFFER, IRREPARABLE HARM IF HER MOTION IS DENIED**

Plaintiff's motion for a temporary restraining order must be denied because she cannot demonstrate that she will suffer irreparable harm without the requested emergency injunctive relief. In her prayer for relief, plaintiff requests payment of $200,000 and enforcement of a promissory note allegedly relating to promised financial support of defendants' magazine. See Compl. at 5. In her Motion for a Temporary Restraining Order, plaintiff additionally claims that "[f]or every week that the magazine is not published, Covert Action Publications loses $3,000 in lost sales, subscriptions, and renewals." Mot. for TRO at ¶ 4. As the D.C. Court of Appeals has emphasized, however:

24

> [I]t is well established that economic and reputational injuries are generally not
> irreparable. As the United States Court of Appeals has said in the leading case on
> preliminary injunctive relief: 'The key word in this consideration is irreparable.
> Mere injuries, however substantial, in terms of money, time, and energy
> necessarily expended in the absence of a stay, are not enough. The possibility that
> adequate compensatory or other corrective relief will be available at a later date,
> in the ordinary course of litigation, weighs heavily against a claim or irreparable
> harm.

Zirkle v. District of Columbia, 830 A.2d 1250, 1256 (D.C. 2003) (emphasis added), quoting

Virginia Petroleum Jobbers, 259 F.2d 921, 925 (D.C. Cir. 1958). As plaintiff, should her

complaint ultimately prove successful, can be fully compensated at a later date through the award

of money damages, she is not able to show irreparable harm that requires the grant of an

emergency injunction.

In fact, according to the Complaint, the only justification for a temporary restraining order

is "preventing Defendants from looting CAP's bank accounts, stealing its computers, wiping

clean their databases, and removing furniture, equipment, books, and other tangible and

intangible objects from CAQ's offices." Compl. at 5. The loss of office furniture, books, office

equipment, computers, and money in *Covert Action*'s bank accounts, of course, is compensable

through money damages, and clearly does not require emergency equitable relief. The only item

for which it could possibly be argued that money damages would not fully compensate plaintiff

in the event she prevailed on the merits – that defendants should be prevented from "wiping

clean their [computers'] databases" – is completely lacking in factual support or even a well-

plead allegation, as the Complaint does not even allege that defendants plan to wipe clean their

computers' databases. Defendants have absolutely no incentive to harm or destroy CAQ, a

magazine to which Mr. Wolf and Rev. Wheaton have devoted considerable energy and money to

establish and maintain.

In fact, it is the defendants themselves who had and have valid reason to fear that important CAQ property has been or will be destroyed, hidden, or converted. Defendants have reason to believe that Habib may have taken CAQ property, forged checks and erased important information (including email and electronic copies of back issues) from office computers. Likewise, plaintiff herself has attempted to gain access to CAQ's bank account. On July 12, 2005, Mr. Springmann appeared at CAQ's bank (Wachovia) and requested access to the CAQ account. Wolf Dec. at ¶ 23. The very next day, Ms. Cottin faxed a letter to Ms. Rinehart, the Assistant Vice President of the bank, in which she asserted, without any basis in fact, that Mr. Springmann was the attorney for Covert Action Publications. Id., and Letter from Cottin to Rinehart, 7/12/05, attached thereto as "Attachment I." She also claimed, falsely, that Mr. Wolf had been voted off the Board of Directors, was "no longer associated with Covert Action Publications," had been named in "a $200,000 lawsuit," and was removing property from CAQ's office. Id. In an appalling attempt to seize control of the Magazine, she asked that the bank freeze the new account "until such time as you place my name as sole signatory on it." Id. Out of caution, Wachovia was forced to freeze the account. Id.

It is ridiculous that the very actions that plaintiff – with no foundation – seeks by this motion to prevent already may have been taken not only by a former employee who Plaintiff wishes to see retained by the Magazine but by the plaintiff and her counsel themselves.

As plaintiff has failed to prove that she will suffer imminent or irreparable harm in the absence of an injunction, plaintiff's motion for a temporary restraining order should be denied.

26

## C.    THE BALANCE OF HARMS WEIGHS AGAINST THE GRANT OF A TEMPORARY RESTRAINING ORDER

The balance of harms in this case also weighs against the grant of plaintiff's motion for a temporary restraining order. Should plaintiff receive the relief that she requests – which includes apparent seizure of defendants' bank accounts, computers, office space, mail, and office equipment, and the compelled transfer of defendants' office keys and lease to plaintiff – defendants will suffer tremendous harm. See Compl. at 5; Mot. for TRO at ¶ 3. Such relief would not only cause defendants tremendous financial harm, but would deny them immediate control over their business assets and prevent them from managing their business.

Moreover, the normal role of preliminary injunctive relief is to maintain the status quo pending resolution of the parties' dispute on the merits. Maintenance of the status quo in this case favors defendants, who are currently in possession and management of CAQ. The relief sought by plaintiff, on the other hand, would require drastic changes in the status quo, and in the management and possession of defendants' business and business assets, which could be irreparable. In fact, if plaintiff simply turns the business back over to Habib, the former editor, as she proclaims, Habib may simply destroy further property belonging to CAQ, as he did in the past. At a minimum, dispossession of their business and business assets would also be extraordinarily inconvenient to defendants, and "the trial judge must consider the inconvenience that an injunction would cause the opposing party." Quaker Action Group v. Hickel, 421 F.2d 1111, 1116 (D.C. Cir. 1969). Accordingly, the balance of harm tips in defendants' favor.

27