**D.    THE PUBLIC INTEREST WEIGHS AGAINST ISSUANCE OF A TEMPORARY RESTRAINING ORDER.**

Finally, plaintiff has failed to demonstrate that the public interest weighs in favor of issuance of a temporary restraining order. Despite her own (and counsel's) attempts to seize assets and accounts of the Magazine, plaintiff has no right to property of CAQ. As this Court has recently recognized, "[t]he judicial system should not encourage, sanction, or foster fraudulent transfers of property. Since the transfer of control of the Magazine needed be fraudulent, the public interest weighs in favor of maintaining the status quo until the transaction can be further addressed." Mooring Tax Asset Group, LLC v. Marks, 2005 WL 1140448, at *3 (D.C. Super. May 10, 2005).

Moreover, the public interest is clearly that the persons who has been running the Magazine for 27 years continue to publish the Magazine, as they intend to do. In fact, plaintiff's efforts and those of her counsel seem to be aimed more at destroying the Magazine. Plaintiff apparently has no ability or interest in actually running the Magazine or in addressing the problems that are common to a small publishing venture. Were the Court to provide Plaintiff with her requested injunction, it would reward her improper behavior, and give her control over a magazine of which she has little working knowledge, thereby endangering a magazine of longstanding reputation.

**IV.    CONCLUSION**

As plaintiff has failed to demonstrate any likelihood of success on the merits, has suffered no irreparable harm, the balance of harms favors defendants, and the public interest is best served by ruling for plaintiffs, this Court must deny plaintiff's action for a temporary restraining order.

Respectfully submitted,

_____
Lynne Bernabei (#938936)
Ari M. Wilkenfeld (#461063)
Avi Kumin (#475761)
BERNABEI & KATZ, PLLC
1773 T Street, N.W.
Washington, D.C. 20009
(202) 745-1942

Counsel for Defendants Louis Wolf, Dolores Neuman,
Phillip Wheaton, and Susan Wheaton

DATED: July 19, 2005

29

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Defendants' Opposition to Plaintiff's Motion for a

Temporary Restraining Order has been served on plaintiff by telecopier and first-class mail, this

19th day of July, 2005 to:

      J. Michael Springmann, Esquire
      Law Office of J. Michael Springmann, PLLC
      4619 Yuma Street, N.W.
      Washington, D.C. 20016

      Counsel for Plaintiff

                                    _____
                                      Ari M. Wilkenfeld

## IN THE SUPERIOR COURT
## FOR THE DISTRICT OF COLUMBIA

HEATHER COTTIN,                          )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )     No. 2005 C.A. 004952B
                                         )
LOUIS WOLF, ET AL.,                      )
                                         )
          Defendants.                    )

## ORDER

Upon consideration of Plaintiff's Motion for a Temporary Restraining Order, Defendants'

Opposition to Plaintiff's Motion for a Temporary Restraining Order, and any Reply thereto, and

the entire record of this case,

It is hereby **ORDERED**, that Plaintiff's Motion for a Temporary Restraining Order be,

and hereby is, **DENIED**.

IT IS SO ORDERED, this _____ day of _____, 2005.


                         _____
                         Judge in Chambers

## IN THE SUPERIOR COURT
## FOR THE DISTRICT OF COLUMBIA

HEATHER COTTIN,                    )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )    No. 2005 C.A. 004952B
                                   )
LOUIS WOLF, ET AL.,                )
                                   )
        Defendants.                )
                                   )

## DECLARATION OF LOUIS WOLF

I, Louis Wolf, this 14 th day of July, 2005, declare and state as follows:

1.      I am making this declaration based on personal knowledge, and I am competent to testify to the matters stated below.

2.      I am submitting this Declaration in support of Defendants' Opposition to Plaintiff Heather Cottin's Motion for a Temporary Restraining Order ("the Motion") in Civil Action 05-4962.

3.      I am 64 years old and married to Dolores Neuman.

4.      I am one of three original founders of a publication called Covert Action Quarterly ("CAQ" or "the Magazine"). I founded CAQ with Ellen Ray and William Schaap in 1978. CAQ was incorporated in the District of Columbia. CAQ researches and documents the activities of the U.S. Intelligence community and reports on the impact of such activities both in the United States and abroad. To date CAQ has published 78 editions. CAQ is funded by donations and subscription payments. It maintains a good reputation and has a substantial and

DECLARATION OF LOUIS WOLF

Exhibit 1

valuable subscriber list.

5.      In the beginning (from 1978 to 1985), all money for the Magazine came from subscriptions and donations from individual supporters. The three of us (Ms. Ray, Mr. Schaap, and myself) did all the fundraising. In 1985, my wife and I, with some contributions from my parents, began contributing. From 1986 to 1998, we donated $1,500 per month to the Magazine, plus approximately $20,000 annually for such incidental expenditures as storage, insurance, and emergency expenses. From 1998 to 2000, we donated $2,000 per month to the Magazine, plus incidental expenditures. From 2001 to February 2005, we donated $6,000 per month to the Magazine. In the last twenty years, we have contributed over three-quarters of a million dollars to CAQ. During the last four years, our donations have represented almost half of the Magazine's $150,000 budget.

6.      When CAQ was founded in 1978, Ms. Ray served as the Magazine's President, I served as its Vice President, and Mr. Schaap served as Secretary/Treasurer. In March 2001 both Ms. Ray and Mr. Schaap resigned their positions with the intention of starting an on-line version of the publication.

7.      In the fall of 2001 CAQ formed a Board of Advisors. The original CAQ Advisory Board was comprised of Reverend Philip Wheaton, Bill Montross and J. Michael Springman. In the fall of 2002, a Board of Directors was formed when J. Michael Springmann resigned from the Advisory Board, with me serving as its President and Rev. Wheaton as Vice-President. The main rationale for forming an official Board of Directors was to assist the Magazine in setting and implementing its priorities. Three or four months later, Habib (the Magazine's editor) and I approached Heather Cottin, the plaintiff in the present matter, about filling the vacancy on the

DECLARATION OF LOUIS WOLF

Board. Ms. Cottin said she was interested in filling the vacancy. In 2003, Habib and I invited Ms. Cottin to join the Board of Directors as a member. Ms. Cottin was an unpaid Board member and did not have any sort of contract, for employment or other services, with CAQ.

8.    Ms. Cottin lives in New York. Since she has joined the Board, the Board has held at least four official meetings of the Board of Directors. For each meeting, I provided Ms. Cottin with notice of the meeting, and informed her that her expenses for traveling to Washington, D.C. for the meetings would be paid. Because Ms. Cottin was a schoolteacher during the relevant time period, I always scheduled the meetings on the weekends and at times convenient for her participation. Despite her agreement to serve on CAQ's Board of Directors, Ms. Cottin did not attend, or even participate by telephone in, a single CAQ Board Meeting. Nor has she participated in the management or operation of the Magazine in any way. She has never visited CAQ's office in Washington, D.C., or raised or donated any money to the Magazine.

9.    From October 2001 to November 2002, Richard Ray served as the Magazine's editor. On November 4, 2002, Mr. Ray left CAQ, taking or destroying a number of different pieces of CAQ property. Mr. Ray then claimed that CAQ owed him severance, resulting in an arbitration with CAQ, held under the rules of the American Arbitration Association. In December 2002, Mr. Springmann resigned from the Board of Advisors, storming out of an informal meeting, and stating that he did not want to continue sitting at the meeting or do any further work for the Magazine. In July 2004, Mr. Springmann testified for Mr. Ray at the Arbitration hearing. He testified that Mr. Ray was entitled to all of the severance he claimed. On August 9, 2004, the Arbitrator, clearly not crediting Mr. Springmann's testimony, ruled against Mr. Ray. The Arbitrator found that Mr. Ray had been paid all severance to which he was

DECLARATION OF LOUIS WOLF

entitled, and that Mr. Ray was, in fact, liable to CAQ for filing a frivolous and baseless arbitration and for his theft and destruction of CAQ property. The Arbitrator ordered Mr. Ray to reimburse to CAQ $8,000 for the lost or destroyed property, and to reimburse CAQ for the attorney's fees and costs the magazine incurred in defending the suit.

10.    Mr. Springmann, an obviously disgruntled former CAQ Board Member who was unsuccessful at harming the Magazine through Mr. Ray's arbitration, is now serving as counsel for the Plaintiff in this case.

11.    A major issue confronting the Board before, and after Ms. Cottin's ascension to the Board, was an ongoing pay dispute with its editor, Habib. (Even though Habib worked for CAQ from 1991 to 2005, on a part-time basis, he has refused to reveal his last name to me.) Habib worked from 1991 to 1998, mostly in the evening hours at the Magazine and during the final weeks prior to its quarterly publication, and was paid for his services. In early 2001, Habib complained that the Magazine owed him $27,000 for past services. The Magazine provided Habib with three separate payments of $9,000 each to satisfy the alleged shortfall. The last payment was made in March 2001, at which time Habib stated that the Magazine was "even" with him regarding his backpay. During this time, Habib also stated that he wanted to receive $24,000 a year going forward. The Magazine agreed to pay him this amount - $2,000 a month..

12.    Yet, beginning in the fall of 2002, Habib claimed that the Magazine still owed him backpay. This has been a difficult issue to resolve because of Habib's personality, and his inability to determine how much backpay he believes he is entitled to. At different times, Habib has claimed that he is owed $60,000, or $150,000, or $200,000. Habib has grown increasingly abusive towards myself and Rev. Wheaton. In early 2004, Habib threatened to cease editing the

DECLARATION OF LOUIS WOLF

Magazine if I did not pledge to continue my financial support. Under that duress, on March 3,

2004, I pledged to Covert Action Publications to continue to provide financial support to the

Magazine. I was provided no consideration for my pledge of continued support. Neither Covert

Action Publications nor CAQ took any steps in reliance on my charitable pledge.

13.     Rev. Wheaton tried to mediate this dispute with Habib, but was disappointed in

his efforts. Habib would change the amount he claimed to be owed to him as backpay, or refuse

to cooperate with Rev. Wheaton's various efforts to help broker a resolution. At one point, Rev.

Wheaton enlisted the assistance of a private independent mediator, Dr. John Johnson. A

mediation was scheduled for and held with Dr. Johnson on December 18, 2004 at CAQ's office

in Washington, D.C. Habib and Ms. Cottin refused to participate. Ms. Cottin stated her

objections in an email to me (attaching a copy of a letter to Rev. Wheaton) dated December 17,

2004. See Email from Cottin to Wolf, 12/17/04, attached hereto as "Attachment A." Ms. Cottin

opened the letter by writing:

> I have been a worker most of my life, and always in a union. When management is at
> odds with labor occasionally they could both agree that the impasse would only be
> resolved by submitting to arbitration or mediation. In my experience as a union militant,
> since 1966, management was always desirous of forcing us to submit to the decision of
> outside forces.

Ms. Cottin expressed vehement disregard for the mediation process, and called attempts to

mediate Habib's dispute "bullying and dictatorial." Without any knowledge of the Board's

attempts to resolve Habib's dispute or of the Magazine's payments to him, she added:

> I absolutely deny the right of management, in this case two ill-advised members of the
> Board of Covert Action Publications, to force labor (the editor of the magazine) to do its
> bidding in matters concerning contract and slavery. The theft of services from Habib is in
> violation of US labor law including the 13th Amendment, which prohibits slavery.

DECLARATION OF LOUIS WOLF

She signed the letter, "[I]n solidarity with the workers and the oppressed, Heather Cottin." After the mediation, Dr. Johnson called Habib, who expressed similar hostility to the mediation process. Following a verbal outburst by Habib at Rev. Wheaton, all major efforts to resolve the pay issue with Habib broke down.

14.     In January 2005, Rev. Wheaton and I both went on separate trips. I traveled to Vietnam and Laos with my wife, leaving the United States on January 7, 2005, and returning on January 27, 2005. Immediately upon my return to the United States, I was hospitalized in Chicago for a blood clot in my leg that my doctors deemed life threatening. In the beginning of March, I was flown by air ambulance to Georgetown University Medical Center, where I had two surgeries – ultimately, I underwent nine different surgeries – in an attempt to save my leg. By March 9, 2005, it was apparent that my leg could not be saved and I underwent surgery to have it amputated. A day earlier, Rev. Wheaton underwent quintuple heart bypass surgery.

15.     During our respective stays in the hospital, Rev. Wheaton and I had no ability to monitor or control Habib or his activities vis-a-vis CAQ. I returned to CAQ's office in early May 2005. I found the office to be in total disarray. I found a number of checks, from subscribers, donors and retail distributors, that should have been deposited in the Magazine's bank account but were not. I could not find deposit slips, the Magazine's checkbook or bank statements. There were piles of unopened mail, including letters that should have been directed to Rev. Wheaton and myself. In short, I discovered that, in our absence, Habib had completely neglected the Magazine and apparently hidden, taken, or destroyed Magazine property.

16.     In early May, 2005, I met with Jim Drew, CAQ counsel, Rev. Wheaton, Bill Montross, and my wife. At that meeting, my wife and I mentioned that we had learned from

DECLARATION OF LOUIS WOLF

examining CAQ's bank account of two CAQ checks that were payable to Habib (in the amount of $3,000 each) that Rev. Wheaton had written recently and signed. Rev. Wheaton denied writing the two checks to Habib. When Ms. Neuman showed Rev. Wheaton the checks, Rev. Wheaton was stunned to find that although he had not signed the checks they had been signed in his name. (Indeed, Rev. Wheaton was traveling in Central America on the date on which one of the checks had been signed.) Because only Rev. Wheaton and I had signatory authority on the account, and because Habib was the staff member with lone access to the checkbook, it seemed likely that Habib had either forged or copied the signature of Rev. Wheaton on the two checks.

17.     Following his recovery from heart surgery, Rev. Wheaton alerted me and Habib that he wanted to resign from CAQ's Board, for health reasons. We immediately began looking for a replacement and tried to schedule a Board meeting to vote in a new member. I identified Mark Looney as an attractive candidate for the expected vacancy. On May 25, 2005, I spoke by telephone with Ms. Cottin about setting up a Board meeting to find a replacement for Rev. Wheaton. I told Ms. Cottin that Rev. Wheaton wanted to resign for health reasons. I also told her that Mark Looney, an activist in the Washington area, had volunteered to join the Board. Ms. Cottin asked what the hurry was, and I informed her that Rev. Wheaton was no longer able to continue because of the increased toll that the disputes at the Magazine were causing to his health. Ms. Cottin said that she knew of people in the District of Columbia, Baltimore, New York, and California who would make good candidates. Therefore, I asked her to submit the names of any people that she thought would be good Board members. Ms. Cottin suggested that I call her back at 7 p.m. on June 1, 2005, when she would agree to the date and time for the Board meeting. After the call, I emailed her Mr. Looney's CV.

DECLARATION OF LOUIS WOLF

18.     As agreed, I called Ms. Cottin at 7 p.m. on Wednesday, June 1, 2005. She said, "I have a meeting, I have to go" and then hung up. I tried to contact her again at 9:30 p.m. There was no answer. Ms. Cottin did not return my earlier phone call. I called Ms. Cottin at 4:30 p.m. on June 2, 2005. There was no answer. I then sent Ms. Cottin an email telling her that I would call her that evening (June 2, 2005) to schedule the Board meeting, which because of Rev. Wheaton's failing health I had scheduled for Friday, June 3, 2005 at 7 p.m. (to be held via conference call with Rev. Wheaton). I informed Ms. Cottin that there would only be one agenda item – Rev. Wheaton's replacement and resignation – and invited her to submit names for his replacement. I informed Ms. Cottin that the "it [was] imperative for us to deal with this immediately" and the situation was an "emergency." See Email from Wolf to Cottin, 6/2/05, and draft thereof, attached hereto as "Attachment B" and "Attachment C."

19.     On Friday, June 3, 2005, at 8:35 p.m., a three-way conference call was set up between myself, Rev. Wheaton and Ms. Cottin. With Rev. Wheaton and myself on the line, the operator tried Ms. Cottin. There was no answer. I do not know whether Ms. Cottin was at home, or whether she refused to answer the phone. Constituting a quorum, Rev. Wheaton and I proceeded with the meeting. I nominated Mr. Looney as a candidate to the Board. Rev. Wheaton asked me a number of questions about Mr. Looney's qualifications, which I answered. Both Rev. Wheaton and I voted to place Mr. Looney on the Board. Thus, by a 2-0 vote, Mr. Looney was elected to the Board of Directors. After Mr. Looney's election, I accepted with deep regret Rev. Wheaton's resignation from the Board. See "June 3, 2005" Notes, attached hereto as "Attachment D."

20.     On June 8, 2005, I sent an email to Ms. Cottin inviting her to a Board Meeting to

DECLARATION OF LOUIS WOLF

take place on June 17, 2005 in Washington, D.C., "with an agenda of all outstanding issues and the future of the magazine." See Email from Wolf to Cottin, 6/8/05, and draft thereof, attached hereto as "Attachment E" and "Attachment F." In the email, I explained that the Magazine would pay for her travel and lodging expenses (as she lived in New York). I also wrote: "If you are unable to come to DC at that time, we can hold the Board meeting by conference call and you can participate fully at any earlier date and time that you suggest by return e-mail." Via letter, Ms. Cottin responded that she considered the meeting to be illegal because I had sent her notice of the meeting by electronic mail, a position that simply made no sense, and, according to CAQ's counsel, was based on a faulty reading of the relevant District of Columbia statute. See Letter from Cottin to Wolf, undated, attached hereto as "Attachment G." She also stated that she wanted to convene her own meeting of the Board of Directors on June 23, 2005 in New York. She did not provide notice of this meeting to Mr. Looney.

21.    On June 17, 2005, a Board meeting was held, with Ms. Cottin again absent. The Board was extremely concerned that Habib would return to the office and attempt to remove or destroy other Magazine assets, as his predecessor Mr. Ray had done. Therefore, we considered and approved five motions – namely, to suspend operations of CAQ for at least three months; to terminate all contractual and financial relationships with Habib and Giang Tran (the webmaster); to stop all activity towards the next issue of the Magazine; to designate me to carry out the decisions and to handle any problems or issues arising therefrom; and to adjourn. Our goal was to suspend all publishing until Habib's situation could be resolved and the Magazine's assets could be secured.

22.    On June 20, 2005, Jim Drew, Michael Earley (the resident manager for 1500

DECLARATION OF LOUIS WOLF

Massachusetts Avenue), my wife, two locksmiths, and I went to CAQ's office. Upon arrival, we realized that the bottom lock already had been changed. The lock had to be changed again before we could enter the office. The office was again in a state of complete disarray. There were piles of papers on the desks and stacks of unopened mail. The Magazine's deposit slips, checkbook, and bank statements were still missing. There were opened and unopened envelopes containing bills that were long overdue, as well as opened envelopes from subscribers, with checks removed - checks which have not yet been located. There were donations going back six months that had not been deposited in the CAQ account. There were also unopened tax notices. During this visit, I taped a note to the door informing Habib of the Board's action of June 17, 2005. See Note from Wolf to Habib, 6/17/05, attached hereto as "Attachment H." A copy of the note was also left with the receptionist in the building. The receptionist later informed me that she had given the note to Habib. Although the note advised Habib to contact Mr. Drew regarding any outstanding financial issues, he never contacted Mr. Drew.

23.    On June 20, 2005, fearing that Habib would convert CAQ assets, and on the advice of legal counsel, I closed CAQ's bank account with Wachovia (which we the Magazine had maintained since 1978) and opened another account with the same bank. On July 12, 2005, Mr. Springmann appeared at the bank and requested access to the account. He was told that only signatories have access to the account; he admitted that he was not a signatory. The following day, Ms. Cottin faxed a letter to Debbie Rinehart, the Assistant Vice President of the bank. See Letter from Cottin to Rinehart, 7/12/05, attached hereto as "Attachment I." In it, Ms. Cottin asserted, without any basis in fact, that Mr. Springmann was the attorney for Covert Action Publications. She also claimed that I had been voted off the Board of Directors, was "no longer

DECLARATION OF LOUIS WOLF

associated with Covert Action Publications," had been named in "a $200,000 lawsuit," and was removing property from CAP's office. In yet another attempt to seize control of the Magazine, she asked that the bank freeze the new account "until such time as you place my name as sole signatory on it." Out of confusion over who rightfully should have access to the account, Wachovia has frozen the account.

24.    In early July, I learned that two computers in the office that contained information – including emails – critical to CAQ had been largely erased. Recently, I have also learned that the Magazine's electronic copies of issues 75 to 78 have been removed from the hard drive of another computer, the office Mac.

25.    I categorically deny the scurrilous allegations contained in the Complaint which have no basis in fact and are clearly designed to embarrass me, my colleagues, family members, and CAQ, to force me to pay Ms. Cottin, Habib, or Mr. Springmann exorbitant amounts of money.

26.    As an officer and director of the CAQ Board of Directors, and publisher of CAQ, it is our prerogative, not to mention our responsibility, to terminate employees who are performing poorly, and certainly to terminate an employee such as Habib whom we suspected of severely neglecting his duties, erasing critical information from our computers, attempting to lock us out of CAQ's office, and apparently forging or copying the signature of a Board Member. Now that Habib has been terminated and CAQ's assets secured, we fully intend to hire a new editor and to resume publication of CAQ as soon as possible. There is simply no basis to suggest that I would attempt to destroy the magazine that I co-founded, have funded, and have published for 28 years.

DECLARATION OF LOUIS WOLF

I declare, this 19 day of July, 2005, subject to the pain and penalty of perjury, that the foregoing is true and correct to the best of my knowledge, upon information and belief.


                              _____
                              LOUIS WOLF


DECLARATION OF LOUIS WOLF

IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEATHER COTTIN,<br><br>    Plaintiff,<br><br>    v.<br><br>LOUIS WOLF, ET AL.,<br><br>    Defendants. | No. 2005 C.A. 004952B |

## DECLARATION OF PHILIP WHEATON

I, Phillip Wheaton, this _19_ th day of July, 2005, declare and state as follows:

1.    I am making this declaration based on personal knowledge, and I am competent to testify to the matters stated below.

2.    I am submitting this Declaration in support of Defendants' Opposition to Plaintiff Heather Cottin's Motion for a Temporary Restraining Order ("the Motion") in Civil Action 05-4962.

3.    I am 80 years old and have been an ordained Episcopal priest since 1952.

4.    In the fall of 2001, Louis Wolf approached me about the possibility of my serving on an Advisory Board for the Covert Action Quarterly ("CAQ"). Since 1978, I had contributed a few articles to the Magazine and was quite familiar with its operations. I agreed to serve on the Advisory Board, which was comprised of Bill Montross, J. Michael Springmann, and myself in an advisory capacity, with Mr. Springmann also providing CAQ with occasional legal advice. Mr. Springmann is currently serving as counsel for Plaintiff in this matter.

DECLARATION OF PHILIP WHEATON

**Exhibit 2**

5.    Between 1991 and 2005, a man named Habib – who has never given his last name – provided both voluntary service and staff assistance to the various editors of the Magazine. Soon after I joined the Advisory Board, I learned of the dispute between Habib and the Magazine over backpay.  There has been a protracted effort to resolve this issue because Habib never specified the amount he was owed, and refused to discuss details of this matter with me or with the Board members during Board meetings.  (Only recently, and after my repeated requests that he discuss his claims, did Habib inform me that he might be willing to settle for around $60,000 to $65,000.)

6.    From 2001 to November 2002, Richard Ray served as the Magazine's editor.  On November 4, 2002, Mr. Ray left CAQ, taking or destroying a number of different pieces of CAQ property.  Mr. Ray then claimed that CAQ owed him severance, resulting in an arbitration with CAQ.  In December 2002, Mr. Springmann resigned from the Board of Advisors, storming out of an informal meeting and stating that he did not want to continue or do any further work for the Magazine.  A few months later, Mr. Springmann testified for Mr. Ray at the Arbitration hearing. He testified that Mr. Ray was entitled to all of the severance he claimed.  On August 9, 2004, the Arbitrator, clearly not crediting Mr. Springmann's testimony, ruled against Mr. Ray.  The Arbitrator found that Mr. Ray had been paid all salary to which he was entitled, and that Mr. Ray was, in fact, liable to CAQ for filing a frivolous and baseless arbitration and for his theft and

destruction of CAQ property. The Arbitrator ordered Mr. Ray to pay CAQ $8,000 for the lost or

destroyed property, and to reimburse CAQ for the attorney's fees and costs the magazine

incurred in defending the suit.

     7.     Mr. Springmann, an obviously disgruntled former CAQ Board Member who was

DECLARATION OF PHILIP WHEATON

unsuccessful at harming the Magazine through Mr. Ray's arbitration, is now serving as counsel for the Plaintiff in this case.

8.    Following the resignation of Mr. Ray in late 2002, I was asked to join the Board of Directors of Covert Action Publications ("CAP") as its Vice President, along with Mr. Wolf, its President. A few months later Habib and Mr. Wolf approached Heather Cottin about joining the Board as its Treasurer. She joined the Board in 2003. While this Board is legal and carried out its official functions, it never operated as a Board that closely controlled staff management, or the financial or editorial policies of the Magazine.

9.    Ms. Cottin lives in New York State. To my knowledge, she has never participated in the management or operation of the Magazine, and has never even visited the CAQ's offices in Washington, D.C. Ms. Cottin was an unpaid Board member and did not have any sort of contract, for employment or other services, with CAQ. I specifically recall two meetings – a CAQ mediation meeting aimed at resolving the conflict between Habib and Mr. Wolf (see below), and an official Board meeting scheduled for February 2005 to resolve the Habib debt issue – to which she was invited by letter with the assurance that her travel and expenses would be paid. She refused to participate in the mediation, and, to my knowledge, never expressed a willingness to come to the February 2005 meeting (although ultimately it was canceled due to the bad health of myself and Mr. Wolf).

10.    My two main goals since joining CAQ have been to resolve office tension and strife, mainly between Habib and Mr. Wolf, and to reach an agreement concerning the debt owed to Habib. In this process, I did not take sides, but was concerned only with the ongoing success of the Magazine. I had separate conversations with both Habib and Mr. Wolf about this matter.

DECLARATION OF PHILIP WHEATON

On September 14, 2004, Mr. Wolf and Dolores Neuman came to my house to discuss the debt issue and ways of resolving the dispute. I made it absolutely clear from the outset that this was an informal, not an official, meeting and that no official decisions would be made. During this meeting, I learned, among other things, that on three separate occasions Ms. Neuman had paid $9,000 to Habib to resolve his backpay claim. Habib received the money and expressed to Ms. Neuman that his claim had been satisfied.

11.    A few days later, on Friday, September 17, I met with Habib and Mr. Wolf in the CAQ office. I informed Habib of the meeting at my house a few days earlier, whereupon Habib screamed in protest, claiming that it was an illegal Board meeting. Habib repeatedly insulted me and impugned my character. Among other epithets, he called me "a racist," and said I had "no right to call myself a Christian." He then ran out of the office. After a few minutes, I went down to the lobby of the building, where Habib, upon seeing me, continued to yell at me. I asked him to speak with me outside, where he continued to insult me in a loud voice, despite my repeated explanations that the meeting had been informal and was held to resolve the dispute over his backpay. Unable to continue, I asked him to call me when he was ready to discuss the matter calmly and rationally. He never called me.

12.    Shortly after those outbursts, in September or October 2004, Habib called my wife and told her that if the debt was not paid he would "come after [our] house," a threat that greatly upset my wife.

13.    Although I continued to try to facilitate an agreement with Habib, my efforts were unsuccessful because Habib routinely changed the amount he claimed CAQ owed him as backpay and refused to discuss with me a resolution of his concerns. During the next two

DECLARATION OF PHILIP WHEATON

traveled to Nicaragua with my wife, leaving the United States on or about January 3, 2005, and returning on February 15, 2005. When I returned to the United States I went to visit Mr. Wolf, who was in the hospital with a blood clot in his leg. Almost immediately thereafter I ended up hospitalized myself because the arteries to my heart were severely blocked. Ultimately I had to undergo quintuple heart bypass surgery on March 8, 2005. The next day, Mr. Wolf's leg was amputated.

15.    During our respective stays in the hospital, Mr. Wolf and I had no ability to monitor or control Habib or his activities in the management of the office.

16.    In early May, 2005, I met with Mr. Wolf, Ms. Neuman, Jim Drew (CAQ counsel), and Bill Montross. At that meeting, Mr. Wolf and Ms. Neuman mentioned that they had learned from examining CAQ's bank account of two CAQ checks that were payable to Habib (in the amount of $3,000 each) that I supposedly had written and signed. I denied writing the two checks to him. When Ms. Wolf showed me the checks, I was stunned to find out that although I had not signed the checks, the signatures thereon were mine. The date of one of the checks was February 3, 2005, when I was still in Nicaragua. Because only Mr. Wolf and I had signatory authority on the account, and because Habib was the staff member with lone access to the checkbook, it seemed likely that Habib had either forged or copied my signature on the two checks.

17.    Following my recovery from heart surgery, and because of the extreme stress from these CAQ dynamics, I decided that I needed to resign from CAQ's Board. Mr. Wolf identified Mark Looney as an attractive candidate for the expected vacancy and took a number of steps to contact Ms. Cottin to set up a conference call for the Board members.

DECLARATION OF PHILIP WHEATON

18.    On Friday, June 3, 2005, at 8:35 p.m., a three-way conference call was set up between myself, Mr. Wolf and Ms. Cottin. With Mr. Wolf and I on the line, the operator tried to call Ms. Cottin. There was no answer. It is unclear to me whether Ms. Cottin was at home or whether she refused to answer the phone. Constituting a quorum, Mr. Wolf and I proceeded with the meeting. Mr. Wolf nominated Mr. Looney as a candidate to replace me on the Board. I asked Mr. Wolf a number of questions about Mr. Looney's qualifications, which he answered. Both Mr. Wolf and I voted to place Mr. Looney on the Board. Thus, by a 2-0 vote, Mr. Looney was elected to replace me on the Board. After Mr. Looney's election, I tendered my resignation to Mr. Wolf, who accepted it.

19.    On Friday June 3, 2005, I resigned my post as a CAQ Board member and since that time have not been to the CAQ office. I immediately withdrew my name as a signer of CAQ checks and have had no part in any activities having to do with the CAQ office equipment, files, checks or records since that date, contrary to the charges in the Complaint.

20.    I categorically deny the absurd allegations contained in the Complaint which have no basis in fact and are clearly designed to embarrass me, my colleagues, family members, and CAQ, and to force me to pay Ms. Cottin an exorbitant amount of money.

DECLARATION OF PHILIP WHEATON

I declare, this _19_ day of July, 2005, subject to the pain and penalty of perjury, that the foregoing is true and correct to the best of my knowledge, upon information and belief.

PHILLIP WHEATON

DECLARATION OF PHILIP WHEATON

Copies To:

J. Michael Springmann, Esquire
Law Office of J. Michael Springmann, PLLC
4619 Yuma Street, N.W.
Washington, D.C. 20016

Lynne Bernabei
Ari M. Wilkenfeld
Avi L. Kumin
BERNABEI & KATZ, PLLC
1773 T Street, N.W.
Washington, D.C. 20009

LAW OFFICES

# BERNABEI & KATZ, PLLC

1773 T STREET, N.W.
WASHINGTON, D.C. 20009-7139

LYNNE BERNABEI
DEBRA S. KATZ°
LISA J. BANKS
ARI M. WILKENFELD+
ALAN R. KABAT+
AVI L. KUMIN°
RASHIDA A. ADAMS°
RENEE SERVANCE*
LEMA R. BASHIR'

(202) 745-1942
TELECOPIER: (202) 745-2827
E-MAIL: BERKATZLAW@AOL.COM
WEBSITE: WWW.BERNABEIANDKATZ.COM

OF COUNSEL:

DAVID J. MARSHALL

+ ADMITTED IN MB ALSO
° ADMITTED IN NY ALSO
° ADMITTED IN CA ALSO
* ADMITTED IN WI ONLY
' ADMITTED IN MD ONLY

<u>By Hand Delivery</u>
July 19, 2005

Attn: Judge in Chambers
Office of the Civil Clerk
Superior Court of the District of Columbia
500 Indiana Avenue, N.W.
Room JM-170
Washington, D.C. 20001

     Re:    Heather Cottin v. Louis Wolf, et al.
            <u>No. 2005 C.A. 004952B</u>

Dear Judge in Chambers:

    Please find enclosed a courtesy copy of Defendants' Opposition to Plaintiff's Motion for Temporary Restraining Order.

    Sincerely,

    Ari M. Wilkenfeld

Enclosure

LAW OFFICES
## BERNABEI & KATZ, PLLC
1773 T STREET, N.W.
WASHINGTON, D.C.   20009-7139

LYNNE BERNABEI
DEBRA S. KATZ◦
LISA J. BANKS
ARI M. WILKENFELD +
ALAN R. KABAT +
AVI L. KUMIN◦
RASHIDA A. ADAMS◦
RENEE SERVANCE♦
LEMA R. BASHIR *

(202) 745-1942
TELECOPIER (202) 745-2627
E-Mail: BERKATZLAW@AOL.COM
Website: www.bernabelandkatz.com

OF COUNSEL:
DAVID J. MARSHALL

+ADMITTED IN MD ALSO
◦ADMITTED IN NY ALSO
◦ADMITTED IN CA ALSO
♦ADMITTED IN WI ONLY
* ADMITTED IN MD ONLY

# FACSIMILE COVER SHEET

| | |
|---|---|
| **To:** | J. Michael Springmann |
| **From:** | Ari M. Wilkenfeld |
| **Date:** | July 20, 2005 |
| **Time:** | 10:00 AM |
| **Fax No.:** | (202) 966-1254 |

| DOCUMENTS | NUMBER OF PAGES (Includes cover page) |
|---|---|
| Heather Cottin v. Louis Wolf, et al. | 73 |

*COMMENTS:*

If you have a problem with the transmission of this fax, please call  (202) 745-1942.

Original(s) will be:
        Hand Delivered
X    Sent by U.S. Postal Mail
        Sent by Federal Express
        Original/Draft will not be sent

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS NAMED ABOVE. THIS MESSAGE MAY BE ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH, IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL.

ARI M. WILKENFELD +
ALAN R. KABAT +
AVI L. KUMIN○
RASHIDA A. ADAMS○
RENEE SERVANCE●
LEMA R. BASHIR *

Website: www.bernabeiandkatz.com

+ADMITTED IN MD ALSO
○ADMITTED IN NY ALSO
○ADMITTED IN CA ALSO
●ADMITTED IN WI ONLY
* ADMITTED IN MD ONLY

# FACSIMILE COVER SHEET

**To:**      J. Michael Springmann

**From:**    Ari M. Wilkenfeld

**Date:**    July 20, 2005        **Time:**      10:00 AM

**Fax No.:**   (202) 966-1254

| DOCUMENTS | NUMBER OF PAGES (Includes cover page) |
|---|---|
| Heather Cottin v. Louis Wolf, et al. | 73 |

*COMMENTS*:

If you have a problem with the transmission of this fax, please call (202) 745-1942.

Original(s) will be:       Hand Delivered
                       X    Sent by U.S. Postal Mail
                           Sent by Federal Express
                           Original/Draft will not be sent

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS NAMED ABOVE. THIS MESSAGE MAY BE A ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH, IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL.